FILED

T. Randolph Ferguson (SBN 68326)
rferguson@strtrade.com
SANDLER TRAVIS & ROSENBERG, P.A.
357 North Citrus Avenue
Los Angeles, California 90036
Telephone: (415) 378-3374
Facsimile: 1-888-505-0930
**Attorneys for Relator**

2021 JUL 28 PM 2: 27

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: RO

FEE PAID

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES, *ex rel.*, PLEWS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SUNSONG NORTH AMERICA, INC.; HARCO MANUFACTURING GROUP, LLC; SUNSONG HOLDINGS INC.; QINGDAO SUNSONG CO., LTD.; IMPERIAL CABLE INDUSTRIES CO. LTD.; VIRAYONT GROUP CO., LTD; SUNSONG THAILAND CO. LTD. <br><br> Defendants. | CASE NUMBER: <br> 2:21-cv-06086-JFW-SKx <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** <br><br> **QUI TAM COMPLAINT FOR DAMAGES AND PENALTIES FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT** <br><br> **DEMAND FOR JURY TRIAL** |

The United States of America *ex rel.* Plews, Inc. ("Relator"), complaining of

Sunsong North America, Inc.; Harco Manufacturing Group, LLC; Sunsong

Holdings Inc.; Qingdao Sunsong Co, Ltd.; Imperial Cable Industries Co☐ Ltd.; Virayont Group Co., Ltd.; and Sunsong Thailand Co. Ltd., alleges and states as follows:

1.   This is an action to recover damages and civil penalties on behalf of the United States of America for Defendants' violations of the federal False Claims Act, 31 U.S.C. §3729 et seq. (the "FCA" or the "Act").

### THE PARTIES

2.   Plews, Inc. is the Plaintiff and Relator in this action for  itself and for the United States, 31 U.S.C. §3730(b)(1). Relator is a corporation organized and existing under the laws of the State of Delaware and ☐s the original source of the allegations delineated herein, which are based on its own knowledge, invetig ation, and observation.

3.   Upon information and belief, Defendant Qingdao Sunsong Co, Ltd. ("QS") is a corporation organized and existing under the laws of the People's Republic of China ("China").

4.   Upon information and belief, Defendant Sunsong Holdings, Inc. ("SHI"), is a corporate subsidiary of QS organized and existing under the laws of the State of Delaware.

5. Upon information and belief, Defendant Sunsong North America, Inc. ("SNA"), is a wholly owned subsidiary of SHI organized and existing under the laws of the State of Ohio.

6. Upon information and belief, Defendant Harco Manufacturing Group, LLC ("Harco") is a wholly owned subsidiary of SHI organized and existing as a domestic limited liability company under the laws of the State of Ohio.

7. Upon information and belief, Virayont Group Co., Ltd. ("Virayont") is a company organized and existing under the laws of the Kingdom of Thailand ("Thailand").

8. Upon information and belief, Defendant Imperial Cable Industries Co. Ltd. ("ICI") is a subsidiary of Virayont organized and existing under the laws of Thailand.

9. Upon information and belief, Defendant Sunsong Thailand Co. Lt. ("ST") is a subsidiary of QS organized and existing under the laws of Thailand

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 31 U.S.C. § 3730(b) and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

10.   This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process, an act proscribed by section 3729, and complained of herein, occurred in this federal judicial district and because Defendants have minimum contacts within the United States.

11.   Venue is proper here pursuant to 31 U.S.C. §3732(a) because an act proscribed by section 3729, and complained of herein, occurred in this federal judicial district.

**APPLICABLE LAW**

**A. THE FALSE CLAIMS ACT**

12.   Congress originally enacted the FCA during the Civil War and substantially amended the Act in 1986, 2009 and 2010, to enhance the ability of the United States to recover losses sustained as a result of fraud against it. Congress amended the FCA after finding that fraud in federal programs was pervasive and that the statute, which Congress characterized as the primary tool for combatting fraud against the government, needed modernization. Congress amended the FCA to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

13.  The FCA prohibits, inter alia, knowingly making, using, or causing to be made or used any false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government. 31 U.S.C. § 3729(a)(1)(G). Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

14.  For purposes of the FCA, a person "knows" a claim or statement is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).  The FCA does not require proof that a defendant spe□fically intended to commit fraud. *Id.*

15.  Any person with information about an FCA violation may act as a relator, may bring a *qui tam* action on behalf of the United States, and may share in any recovery.  The FCA requires that the *qui tam* complaint be filed under seal for a minimum of 60 days (without service on the defendant(s) during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

**B. PAYMENT OF CUSTOMS DUTIES**

16. United States Customs Border and Protection ("CBP") is the government agency with primary responsibility to monitor and enforce U.S. trade laws and regulations concerning the importation of foreign goods. 6 U.S.C. §211. One of CBP's responsibilities is the collection of customs duties and fees owed on imported goods.

17. "Entry" refers to the receipt of foreign goods into a United States port. Generally, shippers must formally enter the goods within 24 hours of arrival at the port of entry. 19 U.S.C. § 1434. At or about the time of entry of foreign goods, importers, or their agents (collectively and alternatively, "importers") must file certain documents with CBP that allow CBP to assess the customs duties due on the merchandise and "determine whether any other applicable requirement of law ... is met." 19 U.S.C. § 1484(a)(1)(B); *see also* 19 U.S.C. § 1481. These documents include CBP Form 7501 or its electronic equivalent, which is an entry summary that declares the merchandise's country of origin, value, tariff classification, and the importer's estimate of the correct amount of duties, fees, and other charges that it must pay. *See, e.g.,* CBP Form 7501, which may be found at https://www.cbp.gov/sites/default/files/assets/documents/2019-Dec/CBP%20Form%207501_0.pdf; *see also* 19 C.F.R. §§ 142.11; 141.19(a), 141.86(a), 142.6(a).

Importers also must file a commercial invoice. *See, e.g.,* 19 C.F.R. §§ 141.81, 141.86(a),142.3(a), 142.6(a).

18.  Strict regulatory requirements apply to the customs invoice. The invoice must include, among other requirements:

  • "a detailed description of the merchandise";

  • "the purchase price of each item in the currency of purchase";

  • "the value for each item"; and

  • "the country of origin of the merchandise". 19 C.F.R. § 141.86

19. All invoices must also contain "[t]he appropriate eight-digit subheading from the Harmonized Tariff Schedule of the United States" for each item being imported. 19 C.F.R. § 142.6(a)(4); *see also* 19 U.S.C. § 1202; 19 C.F.R. §§ 141.90; 152.11.

20.  Imported merchandise is classified using Harmonized System ("HS") or Harmonized Tariff Schedule ("HTS") codes. Codes are extremely detailed, comprising up to ten digits, with each successive pair of digits containing more specific information. The first four digits are "headings," the next four digits are "subheadings," and the final two digits are "statistical suffixes." For example, an HTS code whose first two digits are 87 refers to vehicle products. Heading 8708 is the heading for certain "parts and accessories" of motor vehicles. Subheading 8708.94 refers more specifically to "[s]teering wheels, steering columns and

steering boxes; parts thereof." Subheading 8708.94.5000 further limits the classification to the above parts that are for vehicles other than tractors for agricultural use.

21.    Each HTS code has up to three rates of duty: a "general" rate, a "special" rate, and a third rate for imports from certain disfavored nations. General rates are the default duty for countries with which the United States has normal trade relations. *See,* HTSA Basic Edition 2021, Revision 6, General Note 3, *available at* https://hts.usitc.gov/current.

22. Importers generally must deposit estimated duties, including Section 301 China duties, with CBP at the time of entry. 19 U.S.C. § 1505(a); 19 C.F.R. §§ 141.101, 141.103.

23.    The importer or its agent must also affirm on CBP Form 7501 that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities . . . and are true and correct ..." *See* CBP Form 7501 attached hereto as Exhibit A and 19 C.F.R. § 141.19; *see also* 19 U.S.C. § 1485(a) (importers must file a declaration under oath stating that the prices and "all other statements in the invoice or other documents filed with the entry, or the entry itself, are true and correct.").

24.    Importers generally must maintain entry records for five years. 19 C.F.R. § 163.4(a).

## C. <u>SECTION 301 ADDITIONAL DUTIES ON CHINA GOODS</u>

25.  Section 301 of the Trade Act of 1974 ("Trade Act") authorizes United States Trade Representative ("USTR") to investigate a foreign co☐try's trade practices. 19 U.S.C. § 2411(b). If the investigation reveals an "unreasonable or discriminatory" practice, USTR may take "appropriate" action, such as imposing tariffs on imports from the country that administered the unfair practice. 19 U.S.C. §§ 2411(b) and 2411 (c)(1)(B).

26.  The Office of USTR initiated an investigation into China's unfair intellectual property policies and practices pursuant to Section 301 of the Trade Act (19 U.S.C. § 2411) on August 18, 2017.

27.  On August 14, 2017, the President notified the USTR that China engages in certain actions related to intellectual property, innovation, and technology that may negatively impact United States industries. *Findings of the Investigation into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974* (U.S. Trade Rep. Mar. 22, 2018) ("*Section 301 Findings*") at 4, *available at* https://ustr.gov/sites/default/files/Section%20301%20FINAL☐PDF *see also Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (President of the United States, Aug. 17, 2017). The President directed the USTR to determine

whether to investigate under section 301, China's law, policies, practices, or actions that may be harming American interests. *Id.*

28. On August 18, 2017, the USTR initiated a section 301 investigation into a wide range of allegedly unfair practices by the Chinese government. *Section 301 Findings* at 5; *Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213 (U.S. Trade Rep. Aug. 24, 2017) (*Initiation of Section 301 Investigation*). The initiation notice outlined the major areas of focus of the investigation, including the Chinese government's: (1) use of tools, such as its "opaque and discret□onary administrative approval processes," to "regulate or intervene in U.S. companies' operations in China, in order to require or pressure the transfer of technologies and intellectual property to Chinese companies"; (2) acts, policies, and practices that "deprive U.S. companies of the ability to set market-based terms in licensing and other technology-related negotiations with Chinese companies and undermine U.S. companies' control over their technology in China"; (3) direction and unfair facilitation of the "systematic investment in, and/or acquisition of, U.S. companies and assets by Chinese companies" to obtain cutting-edge technologies and intellectual property; and (4) purported unauthorized intrusions into U.S.

commercial networks and other theft of intellectual property. *Initiation of Section 301 Investigation*, 82 Fed. Reg. at 40,213-14

29.    Based on the information gathered, the USTR examined the four categories of acts, policies, and practices identified in the initiation notice and made specific findings as to each one. *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) (*Notice of Section 301 Determination*). The USTR determined that China's technology transfer policies — including systemic pressures to transfer U.S. technology to Chinese firms, as well as outright cyber-theft — were inconsistent with United States and international norms and caused billions of dollars in estimated harm to the United States economy every year. *Id.* at 14,907; *see also Section 301 Findings. ibid* at 17-18.

30.    After making the initial section 301 determination, the USTR, at the direction of the President, determined it would be appropriate to impose an additional 25 percent *ad valorem* duty on products of China, with an annual trade value of approximately $50 billion. *Notice of Section 301 Determination*, 83 Fed. Reg. at 14,907; *see also Actions by the United States Related to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to*

*Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 13,099, 13,100 (President of the United States March 22, 2018) (*March 2018 Presidential Directive*); White House, *Statement on Steps to Protect Domestic Technology and Intellectual Property from China's Discriminatory and Burdensome Trade Practices* (May 29, 2018), *available at* https://china.usembassy-china.org.cn/statement-on-steps-to-protect-domestic-technology-and-intellectual-property-from-chinas-discriminatory-and-burdensome-trade-practices/ ; *Notice of Action and Request for Public Comments Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710, 28,711 (U.S. Trade Rep. June 20, 2018) (*June 2018 Notice of Action*). The additional duties were applied in two tranches or "Lists." List 1 covered 818 tariff subheadings, with an approximate annual trade value of $34 billion. *June 2018 Notice of Action*, 83 Fed. Reg. at 28,711. List 2 covered 279 tariff subheadings, with an approximate annual trade value of $16 billion. *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,823-24 (U.S. Trade Rep. Aug. 16, 2018).

31.  Because Lists 1 and 2 did not have their desired effect of persuading China to eliminate its unfair practices, the President "directed the United States

Trade Representative to identify $200 billion worth of Chinese goods for additional tariffs at a rate of 10 percent." *See* President of the United States, *Statement from the President Regarding Trade with China* (June 18, 2018) (*June 2018 Presidential Directive*), *available at* https://www.govinfo.gov/content/pkg/DCPD-201800432/html/DCPD-201800432.htm. Subsequently, and at the direction of the President, the USTR announced that it was considering increasing the duties from 10 percent to 25 percent *ad valorem. Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: Chinas' Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 83 Fed. Reg. 38,760 (U.S. Trade Rep. Aug. 7, 2018) (*Extension of List 3 Comment Period*). On September 17, 2018, the President released a statement that "[t]oday, following seven weeks of public notice, hearings, and extensive opportunities for comment, I directed [the USTR] to proceed with placing additional tariffs on roughly $200 billion of imports from China." President of the United States, *Statement from the President* (Sept. 17, 2018) (*September 2018 Presidential Directive*), *available at* https://trumpwhitehouse.archives.gov/briefings-statements/statement-from-the-president-4/. The President further directed that "[t]he tariffs will take effect on September 24, 2018 and be set at a level of 10 percent" with a planned increase to 25 percent. *Id.* In accordance with the

Presidential directive, on September 21, 2018, the USTR announced it was imposing List 3 and implementing the two-phase implementation of duties described in the President's September directive. *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974, 47,974-75 (U.S. Trade Rep. Sept. 21, 2018) (*Notice Imposing List 3*). On May 9, 2019, the USTR announced that the increase from 10 percent to 25 percent duties would take effect on May 10, 2019, and that the increase was required because, in the most recent round of negotiations with China, "China has chosen to retreat from specific commitments agreed to in earlier rounds." *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459, 20,459-60 (U.S. Trade Rep. May 9, 2019) (*May 2019 Notice Modifying List 3*).

## D. NATURE OF THE ACTION

32. QS is a company in China focused on the manufacture in China and sale of automobile parts including, *inter alia*, automotive hose and assemblies, including power steering hoses, brake hoses, air conditioning hoses, fuel hoses and assemblies incorporating such hoses ("the Products").

33. Defendant SHI is a wholly owned subsidiary of defendant QS. Defendants SNA and Harco, which are wholly owned by SHI, import the Products into the United States.

34. The Products imported by or on behalf of SNA, Harco and/or SHI are subject to duty rates set forth in the Harmonized Tariff Schedule of the United States and such duties are collected by CBP.

35. The Products imported by or on behalf of SNA, Harco and/or SHI are, in addition to regular duties, also subject to the assessment of additional Section 301 duties if such Products originate in China.

36. In anticipation of the imposition of Section 301 duties on the Products beginning in 2018, the defendants, not including ST, conspired to develop a scheme in which the Products manufactured in China by QS would be transshipped through Thailand, marked falsely to indicate Thailand origin, and documents created falsely stating that the Products had been manufactured in Thailand for the purpose of depriving the United States government of lawfully owed duties.

37. Based on publicly available official vessel manifest data, prior t th e imposition of the additional Section 301 duties on Chinese goods, SNA and Harco imported the Products almost exclusively from their related Chinese manufacturer, QS.

38. Based on the publicly available official vessel manifest data the Products imported by SNA and Harco from QS prior to the imposition of Section 301 duties were correctly declared to CBP as originating in China.

39.    Publicly available official vessel manifest data shows that after imposition of the Section 301 duties on Products from China in 2018, SNA and Harco began importing the Products at United States Ports of Entry, including at the Port of Long Beach, California, principally from defendant ICI and falsely declaring to CBP that the Products originated in Thailand instead of China.

40. On information and belief SNA and Harco continued to supply products to United States customers after imposition of Section 301 duties at prices that did not include any increase for Section 301 duties.

41. On information and belief, the products supplied by SNA and Harco to United States customers had, prior to mid-2018, been correctly marked pursuant to 19 U.S.C. §1304 to indicate country of origin China.

42. On information and belief, Products supplied by SNA and Harco to United States customers after the imposition of China 301 duties predominately were falsely marked to indicate country of origin Thailand in contravention of 19 U.S.C. §1304 and 15 U.S.C § 1124.

43. By falsely declaring to CBP that Products originated in Thailand instead of China, Harco and SNA have evaded China 301 Duty assessments by CBP.

46. Publicly available official vessel manifest data shows that defendant ICI ships the Product from Thailand to SNA and Harco.

47. Defendant ICI is a subsidiary of Virayont; at the time the scheme to evade 301 duties commenced, the chairman of Virayont also owned approximately 10% of the shares of QS and was the second largest shareholder of QS.

48. On information and belief, neither Virayont nor ICI had the excess manufacturing capacity to produce the Products that SNA and Harco falsely claimed to be imported from Thailand.

49. Publicly available financial statements of ICI and Virayont reveal that the companies made no investments in property, plant and equipment that would account for the increased capacity needed to account for the purported manufacture of Product in Thailand.

50. The Products claimed by defendants to have originated at factories in Thailand are virtually indistinguishable in appearance and, based on laboratory analysis, physical properties to Products previously claimed to have been made in China except for the country of origin marking.

51. On information and belief, under the scheme to evade the payment of Section 301 duties Product manufactured in China is shipped by QS to Thailand; imported into Thailand by Virayont; resold or transferred to ICI who then prepares

commercial documents that falsely indicate that the goods originate in Thailand and sells and ships the Products to SNA and Harco in the United States.

52. Since the beginning of the scheme, the defendants QS, ICI, Virayont, SHI, SNA and Harco have knowingly conspired to import, and facilitate the importation of, Chinese manufactured product into the United States with false representations to CBP that it had been made in Thailand which resulted in no payment of the Section 301 duties and a resultant significant economic benefit to defendants.

53. On information and belief, the defendants QS, ICI, Virayont, SHI, SNA and Harco have also conspired and acted to knowingly undervalue the imported merchandise on commercial documents and in documents filed with CBP in order to unlawfully evade the payment of duties.

54. Publicly available financial information for QS reveals that in 2020 QS established ST as a subsidiary in Thailand;

55. On information and belief, QS began in late 2020 to ship the Products and/or components of the Products from China to ST;

56. Publicly available shipping records show that beginning in 2021 SNA has imported the Products from ST with Thailand claimed as the origin;

57. The Products imported by SNA from ST beginning in 2021 should have been declared to CBP as products of China origin and subject to the China 301 duties;

58. On information and belief, the Products imported by SNA from ST have been undervalued in declarations made to CBP and on the commercial documents for the purpose of underpaying duties.

58. With regard to shipments from ST to SNA commencing in 2021, the defendants QS, ST, SNA, HARCO and SHI have on information and belief knowingly conspired to import, and facilitate the importation of, Chinese manufactured product into the United States with false representations that it had been made in Thailand which resulted in no payment of the Section 301 duties and a resultant significant economic benefit to defendants.

59. The ultimate result of these conspiracies and acts is the following:

a. The Chinese manufacturer, defendant QS, was able to sell Product which would not have been accepted or purchased by the related defendant Importers/Purchasers as being cost prohibitive if the correct duties, including Section 301 duties were paid.

b. The economic benefit to the defendant Importers/Purchasers is that the Chinese manufactured Products purchased would be received and resold in

their ongoing business operations without having the additional expense of the Section 301 duties.

c. The defendants ICI, Variyont and ST received an economic benefit from the scheme by receiving remuneration for providing transshipment services and preparing false documents which falsely claimed the Products originated in Thailand.

d. The Government was defrauded out of the payment of the correct amount of duties including Section 301 duties for the Chinese manufactured Products received in the United States after September 24, 2018, which were falsely represented to have been made in Thailand and which were undervalued.

e. United States consumers were deceived by the false markings on the Products that indicated they were manufactured in Thailand.

f. All of the defendants conspired in the schemes to falsely represent to Customs that the Chinese Manufactured Products originated for Customs duty purposes in Thailand.

g. The plaintiff is entitled to damages for all unpaid duties, including Section 301 duties not paid on any Chinese manufactured products based upon a false representation that said product had been manufactured in Thailand or any other country except China and marking duties pursuant to 19 U.S.C. §1304(i).

# PRAYER FOR RELIEF

WHEREFORE, Relator Plews Inc., acting on behalf of and in the name of the United States, respectfully requests that this Court enter judgement in favor of the United States against the defendants as follows:

(1) For civil penalties to be imposed for each and every false claim;

(2) For treble the amount of damages to the United States, plus civil penalties of $11,000 for each false claim;

(3) For all costs of this civil action; and

(4) For pre- and post-judgment interest and for such other and further relief as this court deems just and equitable.

Moreover, Relator Plews Inc., on its own behalf, demands and prays that an award be made in its favor as follows: for 25% of the proceeds collected by the United States if it intervenes and conducts this action, or for 30% of the proceeds if the United States does not intervene; for an amount for reasonable expenses necessarily incurred by the relator in the prosecution of this action; for all

1   reasonable attorney's fees and costs incurred by the relator, and for such other

2   relief which relator may show itself justly entitled.

3

4                          Respectfully submitted,

5

6                          T. RANDOLPH FERGUSON
                           SANDLER, TRAVIS & ROSENBERG, P.A.
7

8   DATED: July 28, 2021
9                          _____
                           T. Randolph Ferguson
10                         Attorney for Relator

11

12                              JURY DEMAND

13

14        Pursuant to Federal Rule of Civil Procedure 38, RELATOR hereby
    demands trial by jury.
15

16                          Respectfully submitted,

17

18                         T. RANDOLPH FERGUSON
                           SANDLER, TRAVIS & ROSENBERG, P.A.
19

20  DATED: July 28, 2021
                           _____
21                         T. Randolph Ferguson
                           Attorney for Relator
22

23

24

25

26

27

28
                                    -23-
                 QUI TAM COMPLAINT AND DEMAND FOR JURY TRIAL

CERTIFICATION OF SERVICE

I am over the age of 18 and not a party to this action. My address is SANDLER TRAVIS & ROSENBERG, P.A., 357 North Citrus Avenue, Los Angeles, California 90036. This is to certify that on July 28, 2021, I caused a true copy of the foregoing COMPLAINT AND DEMAND FOR JURY TRIAL to be served by U.S.P.S. Certified Mail/Return Receipt Requested upon the following:

Merrick B. Garland
Attorney General of the United States
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Civil Process Clerk
United States Attorney's Office
Federal Building
300 N. Los Angeles Street
Suite 7516
Los Angeles, California 90012

T. Randolph Ferguson
Attorney for Relator